# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE RAMIREZ VARGAS,<br>SEM ALVAREZ VARGAS,<br>and GILBERT RODRIGUEZ,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER DENYING<br>MOTIONS TO SUPPRESS**<br><br>Case No. 1:10-CR-15DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendants Jose Ramirez Vargas', Sem Alvarez Vargas', and Gilbert Rodriguez's motions to suppress any evidence and statements obtained as a result of a traffic stop, detention, and interrogation of Defendants and a search of Defendant Sem Vargas' home on December 17, 2009 [Docket Nos. 31, 32, 33]. The court held an evidentiary hearing on the motions on May 5, 2010, and another on June 15, 2010. At both evidentiary hearings, Plaintiff was represented by Vernon G. Stejskal, Defendant Jose Ramirez Vargas was present and represented by Benjamin C. McMurray, Defendant Sem Alvarez Vargas was present and represented by Julie George, and Defendant Gilbert Rodriguez was present and represented by Todd D. Gardner. After the two evidentiary hearings, the parties submitted written memoranda regarding the motion to suppress. The court scheduled closing arguments on the motion for July 28, 2010. Because Defendant Gilbert Rodriguez was not present at the July 28

hearing, his counsel requested that the court not hear arguments. The parties then notified the court that no closing arguments were necessary and the court could rule on the motion based on the written memoranda submitted. Therefore, the court took the motion under advisement on July 29, 2010. The court has carefully considered the parties' memoranda and arguments relating to the motion. Being fully advised, the court enters the following order.

## FINDINGS OF FACT

The investigation of these three defendants began when Defendant Jose Vargas told a confidential source that Vargas had family members in California who could deliver large quantities of methamphetamine. The confidential source was working with Officer Kasey Burrell, a member of the Weber Narcotics Strike Force. The two had worked together on other investigations during the previous six months.

On December 17, 2009, Jose Vargas told the confidential source that his nephew was bringing 5 pounds of methamphetamine from California to Utah, and that he would sell it for $21,000 per pound. Jose Vargas also told the confidential source that the methamphetamine was concealed in a spare tire, and that the nephew would have to stop at a relative's house in West Jordan to remove the drugs prior to making the delivery.

Jose Vargas requested to see the money that would be paid before delivering any drugs to the confidential source. Agents working on the investigation with the confidential source took a picture of $26,000 in Strike Force money and sent it to Jose Vargas' cell phone. Jose Vargas then told the confidential source to send the picture of the money to his nephew's phone, because Jose's cell phone was not able to receive picture messages.

After receiving the photograph of the money, Jose Vargas agreed to meet the confidential

source at the Village Inn in Roy, Utah, to complete the drug transaction. Jose Vargas told the confidential source that he would be arriving with his two nephews. In anticipation of the arranged methamphetamine transaction, several agents set up surveillance in and around the Village Inn parking lot in Roy, Utah. Prior to the suspects' arrival in Roy, all agents were shown a photograph of Jose Vargas, in order to be able to identify him as the target of the investigation when he arrived.

The confidential source was also equipped with an electronic monitoring device, which enabled some of the officers involved, namely Agent Burrell, Sergeant Hutchinson, and Agent Noble, to listen to and record conversations occurring between the confidential source and the suspects. A canine officer, Joey Clark, had radio communication with other officers and was contacted in order to make a traffic stop of the suspects after they left the meeting area. All of the officers involved in the surveillance had access to the radio communications.

Agent Burrell saw a PT Cruiser containing three Hispanic males pull up to the meeting area. Agent Burrell identified one of the men as Jose Vargas from the photograph shown earlier to all agents. Agent Burrell notified all other agents over the police radio that the suspects had arrived and were in the PT Cruiser. Agent Burrell and others observed Jose Vargas exit the PT Cruiser and walk over to meet with the confidential source.

Jose Vargas and the confidential source soon walked over to the PT Cruiser. Agent Burrell observed the confidential source get into the PT Cruiser. Agent Burrell could not understand a lot of the conversation because it was in Spanish. But he overheard the confidential source ask if it was two, which Agent Burrell understood to mean two pounds of methamphetamine instead of the three pounds of methamphetamine the confidential source had

3

agreed to purchase from Vargas that day. Agent Burrell also heard the confidential source use the word photo and heard the sound of him taking a photograph of the drugs on his cell phone.

Agent Burrell then saw the confidential source get out of the PT Cruiser and walk back to his own vehicle. The confidential source immediately told Agent Burrell that he saw the drugs in the front seat of the PT Cruiser in a black bag and that he had taken a picture of the drugs with his cell phone. After Burrell spoke to the confidential source on the transmitter, he relayed the information to all the other officers on the radio.

The confidential source then went back to the suspects and told them that the money was at a hotel and that they should follow him there. The confidential source left the parking lot followed by the suspects in the PT Cruiser. The suspects in the PT Cruiser were under continuous surveillance from the time they entered the area, and had no opportunity to discard the drugs that the confidential source had observed in the PT Cruiser.

One of the agents observed the PT Cruiser enter the roadway without coming to a complete stop. The officers were planning to use an observed traffic violation to make a "wall stop" in order to protect the identity of the confidential source. The observed traffic violation was communicated to Officer Clark, who was the officer the officers were intending to make the stop. However, Burrell testified that whether or not the officers observed a traffic violation, he intended Officer Clark to pull over the suspects based on the information from the confidential source.

Officer Clark stopped the PT Cruiser not long after it exited the Village Inn/Walgreens parking lot. Officer Clark testified that he based his stop on the observed traffic violation and reasonable cause that there were drugs in the vehicle. After pulling the car over, Officer Clark

approached the vehicle and asked for license, insurance, and registration information, just like a normal traffic stop. After running the driver and vehicle information, Officer Clark spoke to the driver, Sem Vargas, about a prior conviction for marijuana. Officer Clark also asked Sem Vargas if there were any narcotics in the car. In response, Sem Vargas stated, "No. You can check if you want." Vargas disputes that he gave Officer Clark consent to search.

Nonetheless, Officer Clark testified that based on his knowledge of the Strike Force investigation confirming that there was methamphetamine in the car and on Sem Vargas' consent to search, Officer Clark ran his police canine around the PT Cruiser. The canine indicated to the odor of narcotics both on the exterior of the car, and on the front seat and console area inside the car. Officer Clark then searched the interior of the PT Cruiser, where he located two large bundles of methamphetamine in a black bag.

Following the seizure of the methamphetamine and the arrest of the three defendants, Agents Burrell and Grogan went to Sem Vargas' residence in West Jordan, Utah to investigate whether the remaining drugs Vargas had referred to were at the home. The officers had called the West Jordan police to do a drive-by of the residence. They were informed that a sport-utility vehicle with California license plates was parked in the driveway.

The officers and occupants of the home had divergent testimony as to what occurred at the home. Because of the consistency of the officers' testimony, the court finds that their testimony more credible. Accordingly, the court finds the facts to be as given by the officers.

Agents Burrell and Grogan knocked on the door, and a young woman answered the door. The agents identified themselves as officers and asked if they could come inside. The officers were in plain clothes and had their weapons concealed. However, they showed the young woman

their badges. The young woman did not hesitate in saying yes and she led the agents into the living room of the residence. Agents Burrell and Grogan told the occupants about the arrest of the three Defendants and stated that they thought there may be drugs at the house. The agents asked if they could look. Jose Vargas' son asked the agents if they had a search warrant and they responded that they did not and that is why they needed consent to search the house. The occupants collectively said there were no drugs inside the house and gave officers permission to look.

Agents identified each occupant by name and recorded those names in their police report. The occupants of the home were very cooperative. Nobody tried to stop the officers and, in fact, some of the occupants helped the agents. Sem Vargas' wife showed them Sem's room, in which the agents located marijuana and some tire irons. Sem Vargas' wife stated that the tire irons had not been in the room when she left for work that morning.

Outside the residence, the agents located a tire with a cut sidewall. The sport-utility vehicle parked in the driveway had a spare tire holder lowered and empty. The spare tire that was located matched the sport-utility vehicle. Agent Burrell got consent from Gilbert Rodriguez's daughter, Rosalina, to search the sport-utility vehicle.

## CONCLUSIONS OF LAW

### I. Vehicle Stop, Detention, Search, and Defendants' Statements

Defendants contend that the stop, detention, and search of the vehicle all violated Defendants' Fourth Amendment rights. Defendants further seek to suppress statements made to officers as a result of the allegedly unlawful stop and detention. The police may lawfully stop a car if they have probable cause or a reasonable, articulable suspicion to believe the car is carrying

6

contraband. *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205-06 (10th Cir. 2007). "The 'automobile exception' to the warrant requirement permits law enforcement officers who have 'probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant.'" *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (citation omitted).

Probable cause is defined as " a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). To determine whether probable cause exists, the court must make a common sense determination from a totality of the circumstances presented as to whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See id.* at 236.

"Reasonable suspicion is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002). Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Callerman*, 273 F.3d 1284, 1286 (10th Cir. 2001).

This case is factually similar to *United States v. Chavez*, 534 F.3d 1338 (10th Cir. 2008). In Chavez, the DEA, through a confidential source, had arranged to purchase a kilogram of cocaine from Chavez's associate, Moreno. *Id.* at 1340. Agents had watched Moreno leave his house, drive to another house, and get in Chavez's pickup. *Id.* at 1341. Moreno then called the confidential source to say he was en route to the prearranged meeting location to complete the

7

cocaine transaction. *Id.* Chavez' pickup was then stopped by a canine officer with the State Patrol, traveling in the direction of the pre-arranged meeting location. *Id.* at 1342. The patrolman who stopped the truck had been given the vehicle's description, plate number, the number of occupants, and was told that the pickup was carrying cocaine. *Id.* at 1341. The patrolman was also told to develop his own basis for stopping the vehicle, in order to protect the identity of the confidential source. *Id.* at 1342.

In *Chavez*, the Tenth Circuit addressed whether the DEA agents had probable cause to believe Chavez's truck contained narcotics and, if so, whether the agents' probable cause could be imputed to the patrolman who pulled over the truck. *Id.* at 1344. The court concluded that the DEA agents had probable cause based on "a credible confidential source's communication with Moreno and the task force's ongoing surveillance." *Id.* at 1345. The agents knew that Moreno had agreed to sell the drugs to a buyer at a truck stop, he planned to have someone drive him there, a man matching his description left his residence, Moreno told the confidential source that he was en route to Santa Rosa with the driver to complete the drug deal, and the truck was heading in that direction. *Id.*

The court then found that the DEA agents' probable cause could be imputed to the patrolman based on "the 'fellow officer' rule, also known as the 'collective knowledge' doctrine." *Id.* at 1345. The court recognized that all the circuits that have addressed the issue "have held that a police officer may rely on the instructions of the DEA (or other law enforcement agencies) in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause." *Id.* at 1347.

In this case, whether or not the attempted "wall stop" was effective, at least Agent Burrell

8

had probable cause that methamphetamine was in the PT Cruiser. The information from the confidential source leading up to and during the controlled buy was credible. Law enforcement officers, with the help of the confidential source, used the telephone to arrange the methamphetamine purchase from Defendant Jose Vargas. Jose Vargas agreed to deliver the methamphetamine at the Village Inn in Roy, Utah. Jose Vargas told the confidential source that he would be arriving with his two nephews, one of whom brought the methamphetamine from California to Utah. The agents and officers involved in the surveillance of the controlled buy were all given a photograph of Jose Vargas, and Agent Burrell testified that he had identified Jose Vargas in the PT Cruiser. Agents observed Jose Vargas and two Hispanic males arrive at the Village Inn parking lot at the appointed time. The confidential source was invited into the defendants' vehicle, where he observed the methamphetamine. Agent Burrell could also hear and understand key points of the conversation between the confidential source and Defendants in the PT Cruiser. After the confidential source exited the PT Cruiser, the confidential source told Agent Burrell that he had seen the methamphetamine in a black bag in the front seat of the PT Cruise and that he had taken a picture of it. The confidential source told the Defendants to follow him to a motel to get the money. The Defendants then followed the confidential source. Based on the information that Agent Burrell had at that time, he had probable cause because there was "a fair probability that contraband or evidence of a crime will be found in a particular place." The PT Cruiser was under constant surveillance by the police officer and there was no likelihood that the methamphetamine had been removed from the car prior to the stop. The probable cause in this case is stronger than in the *Chavez* case.

In addition, the information relayed to Officer Clark, who made the stop in tis case, is

stronger than the information given to the patrolman in *Chavez*. Agent Burrell relayed the information he received from the confidential source to the other officers, including Officer Clark. Officer Clark had seen a photograph of Jose Vargas, been given a description of the vehicle and occupants, and had been tuned into the officers' radio during the surveillance at the Village Inn. While Agent Burrell wanted Officer Clark to find his own basis for making a stop in order to protect the identity of the confidential source, whether Officer Clark had another reason for the stop is irrelevant for purposes of determining the constitutionality of the stop. Constitutionally, there did not need to be another stop. Agent Burrell recognized this in his testimony by stating that the agents planned to stop the PT Cruiser whether or not they found an additional traffic violation. And, Officer Clark acknowledged that he stopped the PT Cruiser based on the traffic violation and reasonable cause that there were drugs in the vehicle. The court concludes that there was probable cause to stop Defendant's vehicle.

Law enforcement officers may lawfully detain the vehicle and all occupants if they have a reasonable, articulable suspicion that the vehicle contains contraband. *United States v. Stone*, 866 F.2d 359, 362 (10th Cir. 1989). "Once the officer's suspicions rise to the level of probable cause, they are empowered to search 'the entire vehicle, including the trunk and all containers therein that might contain contraband.'" *Chavez*, 534 F.3d at 1345. Because there was probable cause that there was methamphetamine in Defendants' vehicle, the court concludes that Defendants' detention and the search of the vehicle met constitutional standards.

The rest of Defendants' issues are superfluous. It is irrelevant whether or not Sem Vargas stopped before entering the public roadway as is required by Utah Code Section 41-6a-907 (2009). It is also irrelevant whether Defendant Sem Vargas consented to the search and

10

whether the police canine gave a proper indication of the presence of an odor of narcotics. Officers in this case had probable cause to stop the Defendants' vehicle and to search it for illegal narcotics. Accordingly, Defendants' motions to suppress on the issues of whether the stop, continued detention, and search were lawful are denied.

Moreover, because the stop and detention were lawful, any statements made by the defendants were not made as a result of an unlawful stop and unlawful detention. As this was the only basis Defendants' advanced to suppress their statements made to officers, Defendants' motions to suppress statements made to officers are denied.

**II. Search of Home**

Defendants next challenge the constitutionality of the search of the West Jordan home. The parties dispute whether valid consent was given. The existence and voluntariness of consent to search is a question of fact to be decided in light of attendant circumstances by the trier of fact. *White v. United States*, 444 F.2d 724, 726 (10th Cir. 1971). Consent can be expressly given or implied by the circumstances. *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir. 1977). For example, if several police officers knock on a door and ask to come in, an occupant of the home who steps aside to allow them entry may be said to have consented. Police officers are not held to a higher standard than ordinary guests, so if a reasonable visitor would conclude that he or she is being invited into a home, police officers can make the same conclusion. *United States v. Carter*, 378 F.3d 584 (6th Cir. 2004), *cert. denied*, 543 U.S. 1155 (2005). Determination of who can give valid consent to search a particular area is also judged by an objective reasonableness standard. The question for the officer who is attempting to obtain valid consent to consider is whether the facts available at the moment warrant a person of reasonable caution to believe that

11

the consenting person (or persons) had authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177 (1990).

As discussed in the findings of fact above, the parties dispute what occurred at the West Jordan home. The court, however, finds the officers' testimony more credible. The officers' testimony regarding the behavior of the occupants of the home was consistent, whereas the occupants of the home who testified had strikingly divergent recollections.

In this case, Agents Burrell and Grogan knocked on the door of the West Jordan residence, and it was answered by a young woman. After they identified themselves as officers, she allowed them to come into the living room of the home to talk to all of the occupants together. Whether the invitation was by a specific statement or by stepping aside and leading the officers into another room to talk to other occupants of the home, her actions could be lawfully interpreted by the officers as consent to enter the home.

Agent Burrell immediately told the occupants of the home that Jose Vargas, Sem Vargas, and Gilbert Rodriguez had been arrested for narcotics trafficking. When asked if they had a search warrant, they told the occupants that they did not. They then explained that they were asking for consent to search the home for other drug evidence. The occupants of the home contained several adults who regularly occupy the home and some who were visiting. Both officers testified that all of the occupants jointly said that there were no drugs in the home and that officers were free to search. The two officers also testified that they were escorted to certain areas by certain occupants, and told that "this is Sem's bedroom," and similar statements. The officers testified that the occupants were cooperative.

Agent Burrell testified that he identified one occupant, Rosalina, as Gilbert Rodriguez's

12

daughter. He specifically asked her for consent to search the sport-utility vehicle in the driveway because Gilbert Rodriguez had previously told him that he and his daughter Rosalina had driven a sport-utility vehicle from California to Utah that day. Agent Burrell testified that Rosalina said in response to his request for consent, "Go ahead. There's no drugs in there." Rosalina testified that she did not give consent to search, but her testimony appeared to be more self-serving than the officers.

The court concludes that consent was unambiguously and validly given by people who had authority over the house. It was not restricted or revoked at any time. Therefore, Defendants' motions to suppress the evidence obtained during the search of the West Jordan home is denied.

## CONCLUSION

Based on the above reasoning, Defendants' motions to suppress [Docket Nos. 31, 22, 33] are DENIED. The stop of the PT Cruiser, and the subsequent detention of the Defendants and search of the vehicle, were lawful based on probable cause. All statements made by the defendants were voluntarily given while in lawful custody. The search of the West Jordan home and the SUV was lawful based on the voluntary consent of the occupants.

DATED this 30th day of August, 2010.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge